UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SEAN PORTER,

                     Plaintiff,                           **MEMORANDUM AND ORDER**

            v.                                15-CV-3558 (RPK) (SJB)

PORT AUTHORITY OF NEW YORK AND
NEW JERSEY, OFFICE OF INSPECTOR GENERAL,
HUNTLEY LAWRENCE, *in his individual and official
capacity*, JOHN TUCCI, *in his individual and official
capacity*, JOHN KANE, *in his individual and official
capacity*, THOMAS L. BOSCO, *in his individual and
official capacity*, PETER QUAGLIA, *in his individual
and official capacity*, and WILLIAM DEVITA, *in his
individual and official capacity*,

                   Defendants.
-------------------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

       Plaintiff Sean Porter brings this action against the Port Authority of New York and New Jersey, the Office of Inspector General at the Port Authority, Huntley Lawrence, John Tucci, John Kane, Thomas L. Bosco, Peter Quaglia, and William Devita.  Invoking 42 U.S.C. § 1983 and other statutes, Mr. Porter alleges discriminatory treatment, retaliation, malicious prosecution, false arrest, unconstitutional searches, selective enforcement, abuse of process, constitutional harassment, and conspiracy.  He also raises state claims of malicious prosecution and abuse of process and alleges a violation of the New York State Human Rights law.  Defendants have moved for summary judgment on all claims.  For the reasons stated below, defendants' motion is granted.

## BACKGROUND

       The following facts are taken from the parties' Rule 56.1 statements and relevant portions of the record and are undisputed unless otherwise noted.

Mr. Porter is an African-American male who was born in Guyana.  Sean Porter Dep. Pl.'s Ex. A at 47:4-9 (Dkt. #88-2) ("Porter Dep.").  He was employed at the Port Authority for nearly twenty years.  *Id.* 28:15-23; 52:19-22.  Over that time, Mr. Porter worked his way up to the position of Manager of Landside Services at John F. Kennedy International Airport ("JFK").  *Id.* 28:4-23; 53:23-54:8; 63:7-10; 89:20-25; 101:17-22; 102:25; 103:1-6; 111:19-25; 120:13-24.

His allegations center around what he describes as the Port Authority's discrimination and retaliation against him because he is an African-American male and because he testified in criminal and administrative proceedings for Francis Croffie, an African-American employee in the Port Authority Aviation Department.

### a.  The Croffie Incident

In 2011, Mr. Croffie had an altercation with a Port Authority police officer and was arrested.  Porter Dep. 257:22-258:25; Hearing Award in the Matter of Francis Croffie, Defs.' Ex. J 1-18 (Dkt. #81-10) ("Croffie Hearing").

Mr. Porter testified at Mr. Croffie's criminal trial in 2011.  *Id.* 259:4-5; Pl.'s Rule 56.1 Statement at 25 ¶ 15 (Dkt. #87) ("Pl.'s 56.1"); Defs.' Rule 56.1 Statement ¶ 32 (Dkt. #80) ("Defs.' 56.1").  His testimony was limited.  He explained only that certain actions Mr. Croffie's took were within the scope of Mr. Croffie's job responsibilities.  Porter Dep. 259:4-262:3.

In June 2012, Mr. Porter testified at an administrative hearing related to the same incident. Porter Dep. 261:15-262:3; Croffie Hearing.  Again, his testimony was limited to explaining the scope of Mr. Croffie's job responsibilities.  Porter Dep. 261:15-262:3; Croffie Hearing 19.

### b.  The Flowers-Lampariello Investigation

In 2013, Mr. Porter investigated a dispute between two of his subordinates, Derek Flowers and Robin Lampariello.  Porter Dep. 269:17-270:10.  Ms. Lampariello filed a complaint against

Mr. Porter and several other Port Authority managers with the Port Authority Inspector General ("IG") alleging that Mr. Porter and the other managers did not conduct a proper investigation. *Id.* 271:19-272:25; John J. Tucci Dep. Pl.'s Ex. B-1 at 27:6-28:8 (Dkt. #88-3) ("Tucci Dep."); Mem. from Michael Nestor to Mary Lee Hannell and Thomas Bosco, Defs.' Ex. K at 3-4 (Dkt. #81-11) ("Lampariello Mem."); Defs.' 56.1 ¶ 39.

John Tucci, a Police Investigator with the IG, was assigned to look into Lampariello's complaint about the investigation. Tucci Dep. 10:3-4; 28:18-24. He was supervised by defendant John Kane, a Supervisory Police Investigator. *Id.* 10:20-22; John Kane Dep. Ex. C at 24:1-12 (Dkt. #88-5) ("Kane Dep.").

At the start of his investigation of Lampariello's complaint, Investigator Tucci spoke with Mr. Porter. Tucci Dep. 33:19-34:21. Mr. Porter told Investigator Tucci that he had already completed an investigation of the dispute between Ms. Lampariello and Mr. Flowers. *Id.* 34:6-7. But when Investigator Tucci subsequently asked Mr. Porter for a copy of the documentation that Mr. Porter put together for his investigation of that dispute, Mr. Porter said that he did not have any documentation and denied having originally said that he had completed an investigation. *Id.* 35:11-24; Lampariello Mem. 3-4.

After Investigator Tucci completed his investigation of Ms. Lampariello's complaint, Inspector General Nestor issued a final report. Lampariello Mem. 1. The report concluded that Mr. Porter had not conducted a proper investigation of the dispute between Mr. Flowers and Ms. Lampariello, had refused to share a copy of Mr. Flowers's complaint with Ms. Lampariello, and had failed to advise Ms. Lampariello and others of the status or conclusion of his investigation. Lampariello Mem. 6. Mr. Porter did not receive a reprimand, counseling, or any other disciplinary action as a result of this investigation into his conduct. *Ibid.*; Porter Dep. 355:13-24.

### c. The Florida-Plates Investigation

While investigating how Mr. Porter and others had conducted the initial investigation of the dispute between Mr. Flowers and Ms. Lampariello, Investigator Tucci ran Mr. Porter's name through a database that supplies information such as addresses, vehicles, and license-status.  Tucci Dep. 41:23-25, 44:24-45:12; Pl.'s 56.1 at 8 ¶ 43.  According to the database, Mr. Porter had numerous vehicles registered out of state and a Florida driver's license.  Tucci Dep. 42:3-25.  Supervisor Kane, who was overseeing Investigator Tucci's work, approved opening an investigation into Mr. Porter's license plates and driver's license.  *Id.* 43:5-44:9.

The investigation revealed the following.  Mr. Porter owned four vehicles registered to an address in Florida.  *Id.* 45:23-48:1.  State Farm insured those vehicles in Florida.  *Id.* 46:24-47:17.  And Mr. Porter held both New York and Florida driver's licenses.  *Id.* 46:1-4, 47:22-25.  Along with Investigator Quaglia, Investigator Tucci then went to Mr. Porter's residence in New York, where they observed the Florida-registered vehicles.  *Id.* 165:11-166:17; Peter V. Quaglia Dep. Pl.'s Ex. E at 24:19-25 (Dkt. #88-7) ("Quaglia Dep.").

The two investigators interviewed Mr. Porter's brother-in-law, Benton White, about the address that Mr. Porter had used in Florida.  Tucci Dep. 92:8-21; Quaglia Dep. 24:24-25:2.  Mr. White said that he and his wife, Altina, were the only owners of the Florida property where Mr. Porter's vehicles were registered.  Tucci Dep. 93:19-94:94:7.

Mr. Porter has since acknowledged that at the time he registered his vehicles at the Florida address, there was no document showing that he or his wife owned any interest in that property, that he paid any money for the purchase of the property, or that he paid property taxes on the property.  Porter Dep. 207:15-209:20.

4

Investigator Tucci and Supervisor Kane then informed three New York prosecutors' offices—the Queens District Attorney, the Suffolk County District Attorney, and the New York State Attorney General—about their findings.  Tucci Dep. 57:10-58:17, 59:8-25, 138:17-139:3. All three offices explained that Mr. Porter's vehicle registration and insurance did not render him criminally liable within New York but might within a different jurisdiction.  *Id.* 57:15-58:19, 139:4-8.  Investigator Tucci also informed State Farm about the results of the investigation, but State Farm indicated that it was not interested in pursuing charges.  *Id.* 262:11-263:4.

At roughly the same time, Supervisor Kane put Investigator Tucci in contact with Florida Highway Trooper Eric Oleson.  *Id.* 51:1-53:3, 56:8-15.  Investigator Tucci informed Trooper Oleson about the IG's investigation and asked him to look into Mr. Porter's license plates and insurance.  *Id.* 52:22-24.

After conducting his own investigation, Trooper Oleson found that Mr. Porter likely committed title fraud.  Eric Oleson Dep. Defs.' Ex. L at 14:2-8, 21:1-22:16 (Dkt. #81-12) ("Oleson Dep.").  More specifically, although Mr. Porter had a Florida driver's license and registered his vehicles in Florida, Trooper Oleson was unable to confirm that Mr. Porter had a Florida residence. *Id.* 54:23-55:23.  Trooper Oleson called Mr. Porter to discuss his vehicle registrations, but Mr. Porter declined to speak to him and said he wanted an attorney.  *Id.* 56:19-57:2.  A short time later, Trooper Oleson prepared an affidavit requesting that criminal charges be brought against Mr. Porter for title fraud and perjury.  *Id.* 57:5-58:5; Oleson Felony Case Report, Defs.' Ex. N (Dkt. #81-14) ("Oleson Felony Case Report").  Assistant State Attorney Stephanie Powers of the Florida State Attorney's Office approved the request for criminal charges, and a warrant was issued for Mr. Porter's arrest.  Oleson Dep. 58:11-14; Pl.'s 56.1 ¶ 64.  Mr. Porter surrendered to Florida

5

authorities on December 16, 2014.  Porter Dep. 180:8-10, 197:3-5.  He was released on bail ten hours later.  *Id.* 183:17-18.

Following Mr. Porter's arrest, Mr. Porter's wife, Sevanesa, submitted an affidavit stating that the Florida property that Mr. Porter had listed as his address on his vehicle registration and insurance was purchased with pooled family finances.  Affidavit of Sevenesa Porter, Defs.' Ex. O (Dkt. #81-15).  Ms. Porter stated that the property was the primary residence for herself and Mr. Porter while he looked for a job in Florida.  *Ibid.*  Altina White also prepared a written affidavit indicating that Mrs. Porter was one of the owners of the Florida Property.  Affidavit of Altina White, Defs.' Ex. P (Dkt. #81-16).  After these affidavits were submitted to State Attorney Powers, she dismissed the criminal charges against Mr. Porter.  Oleson Felony Case Report, Discovery 079.

While Trooper Oleson was investigating Mr. Porter, Investigators Tucci and Quagila went into the Port Authority parking lot to see and take pictures of Mr. Porter's license plate and other out-of-state license plates.  Tucci Dep. 69:15-70-7; Quaglia Dep. 24:19-22.  In the parking lot, they found approximately thirty vehicles with out-of-state license plates.  Tucci Dep. 70:8-10.

All but four were from apparently transient users of the lot, whose vehicles did not appear in subsequent checks of the parking lot.  *Id.* 171:22-172:10, 209:20-210:10.  Investigator Tucci investigated the three cars (other than Mr. Porter's) that were repeatedly sighted there.  *Id.* 74:5-75:10. 116:9-25.

One car belonged to Jose Torres, an employee of Swissport—rather than the Port Authority.  *Id.* 116:9-18.  Investigator Tucci stopped Mr. Torres's car and asked him about the license plates; Mr. Torres admitted that he had out-of-state plates to save money on insurance.  *Id.*

118:7-24.  Investigator Tucci warned Mr. Torres that he was violating New York law and advised him to reregister his plates, but otherwise took no action.  *Id.* 120:13-22.

A second car belonged to an Allied Barton security guard—also not an employee of the Port Authority.  *Id.* 74:5-8.  Investigator Tucci advised the security guard that she was in violation of New York law and suggested she reregister her plates.  *Id.* 124:12-23.

The final car belonged to Kim Dickey, a recently hired Port Authority employee whom Investigator Tucci termed a "high-level manager."  *Id.* 74:11-25, 75:9-10.  But by the time Investigator Tucci checked the registration on Ms. Dickey's vehicle in a database, she had reregistered her vehicle in New York State.  *Id.* 75:1-10.

Although Mr. Porter asserts that all three of these cars belonged to Port Authority "employees," Pl.'s 56.1 at 27 ¶ 22, the evidence he cites establishes that Ms. Dickey was the only Port Authority employee, *see* Kane Dep. 126:14-130:18; Tucci Dep. 70:4-10; Quaglia Dep. 27:9-16.

Investigator Tucci acknowledged that no one from Port Authority contacted Mr. Porter about the plates before Trooper Oleson attempted to do so.  Tucci Dep. 127:10-129:25.

According to Investigator Tucci, Mr. Porter's investigation was different from those of Mr. Torres and the Allied Barton security guard because Mr. Porter worked for the Port Authority "in a very high-level security position."  *Id.* 130:9-14.

### d.  Mr. Porter is Passed Over for Promotion to Senior Positions in 2014

In 2014—as the Florida investigation was being conducted—Mr. Porter was passed over for promotion to several senior positions that opened after an investigation revealed maintenance problems at JFK.  Defs.' 56.1 ¶¶ 77, 81-82; Pl.'s 56.1 at 18 ¶ 77.

The investigation started after two aircraft were damaged by unsecured runway lighting fixtures in 2014.   Thomas Bosco Dep. Defs.' Ex. E 83:10-15 (Dkt. #81-5) ("Bosco Dep."). Inspections of lighting fixtures at JFK, Newark, and LaGuardia airports followed.   The inspections revealed that the fixtures were in substantially worse repair at JFK than at the other airports, so Director Bosco decided to make significant personnel changes at the senior levels of JFK's structure. *Id.* 85:5-25.  He directed JFK's General Manager, Jerry Spampanato, to leave the airport and serve as advisor at headquarters, and he sent defendant Deputy Director Lawrence to act as interim General Manager.  *Id.* 86:13-87:5.  Spampanato's departure had a cascading effect that left several leadership positions open at JFK, Newark, and LaGuardia.  *Ibid.*  Director Bosco decided to forgo the application process and make hiring decisions with input from senior staff.  *Id.* 87:18-88:15, 96:9-16.

Mr. Porter made Director Bosco, Deputy Director Lawrence, and other senior managers aware that he was interested in a promotion and in the positions of Manager of Operations at JFK and Newark airports in particular.  Porter Dep. 249:8-353:25; Pl.'s 56.1 at 19 ¶ 81.

Although Deputy Director Lawrence considered Mr. Porter to be at least minimally qualified for these positions, he did not believe Mr. Porter to be one of the more highly qualified applicants.  Huntley A. Lawrence Dep. Pl.'s Ex. D at 167:15-20 (Dkt. #88-6) ("Lawrence Dep."). Director Bosco did not consider Mr. Porter to be even minimally qualified for the positions because Mr. Porter lacked relevant knowledge, background, and experience.   Bosco Dep. 90:3-25. Although Mr. Porter believed that he was qualified for the position, Porter Dep. 243:10-11, he never explains why.

 Director Bosco and Deputy Director Lawrence, who were responsible for hiring decisions, Bosco Dep. 88:14-19, 96:9-16; Lawrence Dep. 169:16-18, testified that Mr. Porter was not hired

because the safety issues at JFK required someone with strong experience on the aeronautical side of the airport.  Bosco Dep. 99:21-98:9; Lawrence Dep. 164:16-25, 166:3-19.

Deputy Director Lawrence informed Mr. Porter that he would not be receiving a promotion. Porter Dep. 421:4-6; Lawrence Dep. 163:20-166:20; Pl.'s 56.1 at 19 ¶ 82.   During that conversation, Mr. Porter recounts Deputy Director Lawrence telling him that "people like [him]" should not drive "the kind of cars [he] dr[o]ve" because he would "seem too flashy."  Porter Dep. 240:2-6, 254:13-15.  Deputy Director Lawrence remembers it differently.  According to him, he told Mr. Porter that driving with Florida plates posed ethical difficulties and did not look good. Lawrence Dep. 164:24-165:14.

The position of Manager of Operations at JFK was filled by April Gasparri, an Asian-American woman who previously worked at LaGuardia airport.  Lawrence Dep. 169:1-9; Porter Dep. 243:1-25; Bosco Dep. 99:17-100:3.   Ms. Gasparri had substantial experience on the aeronautical side of the airport and with aviation technical services, as well as working with the FAA on safety issues.  Lawrence Dep. 169:1-9; Bosco Dep. 99:17-100:3; Pl.'s 56.1 at 19 ¶ 83. Considering the safety issues at JFK and management's consequent desire to bring in someone from outside JFK, Director Bosco and Deputy Director Lawrence believed Ms. Gasparri to be the strongest choice for the job.  Bosco Dep. 99:17-100:3; Lawrence Dep. 169:3-171:14; Pl.'s 56.1 at 19 ¶ 83.

### e.  The Lost-and-Found Investigation

In early 2015, Supervisor Kane investigated whether Mr. Porter was adhering to Port Authority policies regarding prisoner property.  Kane Dep. 165:7-17; Letter of Reprimand, Defs.' Ex. R 1 (Dkt. #81-18) ("Letter of Reprimand").  As recounted in a reprimand that was ultimately issued to Mr. Porter, JFK's Evidence Custodian had informed Mr. Porter that when prisoner

9

property located in the lost and found was not claimed within six months, a certified letter should be sent to the last known address of the owner advising the owner that the property would be disposed of, and possibly destroyed, if not claimed.  Letter of Reprimand 1.  Despite being advised of that policy, Mr. Porter failed to inventory lost-and-found items, did not send a thirty-day certified letter to the owner, and directed Port Authority Maintenance to remove all of the prisoner's property.  *Ibid.*

Mr. Bosco issued a formal reprimand to Mr. Porter regarding this failure on April 16, 2015. Letter of Reprimand 1.  The letter stated that Mr. Porter's behavior called into question his judgment but that no action would be taken apart from the issuance of the letter of reprimand.  *Id.* 2.  Director Bosco testified that after giving Mr. Porter the letter, he gave Mr. Porter a pep-talk and told him that he had a future with the Port Authority.  Bosco Dep. 44:9-45:2.

### f.   The Buddy-Pass Investigation

In April 2015, Supervisory Police Investigators John Kane and Ed Choo, along with Forensic Auditor William Divita, wrote an investigation memorandum regarding whether Mr. Porter had been given Jet Blue "Buddy Passes" by a cousin who worked for Jet Blue.  Mem. to file of William Divita, Defs.' Ex. V (Dkt. #81-22) ("Mem. to file of William Divita").  The purpose of the investigation was to determine the circumstances surrounding the issuance of any Buddy Passes.  Mem. from Michael Nestor to Norman Burns, Defs.' Ex. W at 1 (Dkt. #81-23) ("Mem to Norman Burns"); Defs.' 56.1 at 17 ¶ 89.  Mr. Porter's cousin, Ossie David, told Port Authority investigators that he had given Mr. Porter "Buddy Passes" on several occasions, but Jet Blue's Buddy-Pass database only recorded Mr. Porter receiving one Buddy Pass.  Mem. to file of William Divita.   A 2015 final report on this investigation did not recommend a reprimand or other discipline.  Mem. to Norman Burns 1 (Dkt. #81-23); Defs.' 56.1 at 17 ¶ 89.  But Mr. Porter disputes

that he was not reprimanded or disciplined because of the Buddy Pass investigation.  Pl.'s 56.1 at 20 ¶ 89.

### g.  Mr. Porter is Passed Over for Promotion to General Manager of JFK AirTran

Several months after Mr. Porter filed this case, Mr. Porter applied for the open position of General Manager of JFK Air Train.  Am. Coml. ¶ 43; Pl.'s 56.1 at 19 ¶ 85; Defs' 56.1 ¶ 85.  Mr. Porter was interviewed, Defs.' 56.1 ¶ 85; Pl.'s 56.1 at 19 ¶ 85, but did not score as well as Sanchita Banerjee-Jiminez, the applicant who was ultimately selected for the position.  Score Sheet for the Candidates for the Air Train Manager Position, Defs.' Ex. T (Dkt. #81-20); Pl.'s 56.1 at 20 ¶ 86.  Ms. Banerjee-Jiminez, a female of Indian descent, has a degree in civil engineering.  Resume of Sanchita Banerjee-Jiminez. Defs.' Ex. U (Dkt. #81-21).  She also had experience as a Manager of Air Train Systems for Bombardier, as an employee of the manufacturer of the JFK Air Train, and as an operator of the Air Train system in Canada.  *Ibid.*

### h.  Mr. Porter's Miami Beach Trip and the Related Investigation, Arrest, and Conviction

Supervisory Investigator Choo investigated a trip Mr. Porter took to Miami Beach in March 2014.  Felony Complaint, Defs.' Ex. Y (Dkt. #81-25).  An executive at a cargo-handling company told Supervisor Choo that the executive had paid for Mr. Porter's trip, including his plane tickets, hotel accommodations, a golf round, dinners, lunches, and other activities.  *Id.* 1-2.  In total, the executive spent over $3,000.  *Ibid.*  According to Supervisor Choo, Mr. Porter was required to file a financial disclosure for this trip but failed to do so.  *Id.* 2-3.

Because his financial disclosure omitted this trip, Mr. Porter was arrested on February 25, 2016 and charged with Offering a False Instrument for Filing in the First Degree—a felony.  Defs.'

56.1 at 18 ¶ 94; Pl.'s 56.1 at 21 ¶ 94.  He was suspended without pay several weeks later.  Porter Dep. 28:9-14.

On September 25, 2017, Mr. Porter was found guilty following a bench trial in New York Supreme Court.  Defs.' 56.1 at 18 ¶ 95; Pl.'s 56.1 at 22 ¶ 95.  Because of that conviction, Mr. Porter's employment with Port Authority was terminated on March 2018.  Defs.' 56.1 at 18 ¶ 96; Pl.'s 56.1 at 22 ¶ 96.

### i.   Procedural History

Mr. Porter filed this suit on June 17, 2015.  *See* Dkt. #1. The operative pleading in this case is his second amended complaint.  *See* Second. Am. Compl. (Dkt. #37).  He alleges discriminatory treatment, retaliation because of his race and his protected First Amendment activity in violation of Sections 1981 and 1983 of Title 42.  Second Am. Compl. ¶¶ 60-80, 125-134.  He further alleges malicious prosecution, false arrest, unconstitutional search, selective enforcement, abuse of process, and constitutional harassment for the Port Authority's investigations and his subsequent arrests in violation of Section 1983.  Second Am. Compl. ¶¶ 80-104.  And he alleges conspiracy and failure to prevent a conspiracy in violations of Sections 1985 and 1986 of Title 42. Second Am. Compl. ¶¶ 105-124.  He also alleges state claims of malicious prosecution and abuse of process and a violation of the New York State Human Rights law.  *Id.* ¶¶ 135-155.  He brings each claim against all defendants.  *Id.* ¶¶ 3-7, 60-155.

Defendants have moved for summary judgment.  *See* Mot. for Summ. J (Dkt. #79).

### STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A fact is material if it might affect the outcome of the suit under governing law." *Ibid*. The movant bears the burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where "the burden of persuasion at trial would be on the non-moving party," the movant "may satisfy his burden of production" either "(1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).

In assessing the record, courts consider cited "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, [and] interrogatory answers[.]" Fed. R. Civ. P. 56(c)(1)(A). Courts view "the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). "It is a settled rule that credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation, internal quotation marks, and alterations omitted).

## DISCUSSION

For the reasons outlined below, defendants' motion for summary judgment is granted for each of Mr. Porter's claims.

### I.    Retaliation Claims

Defendants are entitled to summary judgment on any claims of retaliation that Mr. Porter brings under Section 1983.  *See* Defs.' Mem. of L. in Supp. of Mot. for Summ. J. 9-12 (Dkt. #82) ("Defs.' Mem.") (construing Mr. Porter's retaliation claims as arising under Section 1983 because Section 1981 does not provide a cause of action).[1]  "To state a claim under § 1983, a plaintiff must allege two elements: (1) 'the violation of a right secured by the Constitution and laws of the United States,' and (2) 'the alleged deprivation was committed by a person acting under color of state law.'"  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015) (quoting *Feingold v. New York*, 466 F.3d 135, 159 (2d Cir. 2004)).  A state employee acting in his official capacity is acting "under color of state law." *Ibid.* (citing *Feingold*, 466 F.3d at 159).  Mr. Porter alleges two forms of actionable retaliation.  First, he claims that he was retaliated against because of his opposition to racial discrimination at Mr. Croffie's trial and disciplinary hearing.  Pl.'s Opp'n 2.  Second, he claims that he was retaliated against for exercising his First Amendment right to testify at Mr. Croffie's trial and disciplinary hearing.  *Id.* at 2-4.  Both claims fail.

### a.   Retaliation Based on Protesting Racial Discrimination

Mr. Porter has not set forth evidence from which a factfinder could conclude that any defendant has retaliated against him for opposing racial discrimination.  Once the color-of-law requirement is met, a claim for retaliation in violation of Section 1983 parallels a claim for retaliation under Title VII and is reviewed under the burden-shifting approach for such claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973).  *See Vega,* 801 F.3d at 88, 91; *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing *Hicks v. Baines*, 593

---

[1] Any retaliation claims that Mr. Porter brings under Section 1981 are dismissed as abandoned.  Defendants moved to dismiss plaintiff's Section 1981 claims, invoking the principle that Section "1981 does not provide a separate private right of action against state actors," *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018), such as the Port Authority, *see Sooroojballie v. The Port Authority of New York and New Jersey*, 816 F. App'x 536, 540 (2d Cir. 2020).  Since Mr. Porter offered no defense of his Section 1981 claim in his opposition brief, that claim is abandoned.  *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014).

F.3d 159, 164 (2d Cir. 2010)).  At the first step under the *McDonnell Douglas* framework, "the plaintiff must establish a *prima facie* case of retaliation by showing 1) participation in a protected activity; 2) the defendant's knowledge of the protected activity; 3) an adverse employment action; and 4) a causal connection between the protected activity and the adverse employment action." *Zann Kwann,* 737 F.3d at 844 (citation and quotation marks omitted).  Once a plaintiff meets this initial burden, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for the adverse employment action.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010) (citation omitted).  If the defendant does so, the burden returns to the plaintiff to show that the real reason for plaintiff's adverse employment action was his protected activity.  *Ibid.* (citation omitted).

Mr. Porter has failed to make out a *prima facie* case of retaliation for opposing racial discrimination, because he has offered no evidence of defendants' knowledge that he engaged in such opposition.  "[I]mplicit in the requirement that the employer have been aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's complaint was directed at conduct prohibited by Title VII" or Section 1983. *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 107-08 (2d Cir. 2011).  In other words, here, the defendants must have been on notice that plaintiff's speech or actions were a protest against racial discrimination.  Mr. Porter has not offered evidence to support such an inference. He rests his claim of retaliation for opposing racial discrimination on his assertion that he suffered adverse employment action after he "testified at Mr. Croffie's criminal trial and disciplinary hearing about the Port Authority's racial discrimination."  Pl.'s Opp'n 3.  But Mr. Porter's testimony at Mr. Croffie's trial and hearing was not about racial discrimination—instead, it was limited to explaining Mr. Croffie's job responsibilities.  Porter Dep. 259:4-262:3.  Defendants

15

could not have inferred from the testimony—or any surrounding circumstance that Mr. Porter has alleged—that his testimony on that subject amounted to opposition to racial discrimination. *See, e.g.*, *Ottley-Cousin v. MMC Holdings, Inc.*, No. 16-CV-00577 (MKB), 2019 WL 1994488, at *13 (E.D.N.Y. May 6, 2019); *Int'l Healthcare Exch., Inc. v. Glob. Healthcare Exch.*, LLC, 470 F. Supp. 2d 345, 357 (S.D.N.Y. 2007).  Summary judgment is accordingly granted to defendants on Mr. Porter's race-based retaliation claim.

### b.  Retaliation Based on First Amendment Activity

Mr. Porter has also failed to put forth evidence from which a reasonable jury could infer that any defendant retaliated against Mr. Porter for his exercise of First Amendment rights.  To succeed on a First Amendment retaliation claim under Section 1983, a plaintiff "must demonstrate by a preponderance of the evidence that the [speech or conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [speech or conduct] and the adverse employment action." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 47 (2d Cir. 2014) (quoting *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994)) (internal quotation marks omitted).  "Should a plaintiff demonstrate these factors, the defendant has the opportunity to demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct." *Ibid*. (quoting *Blum*, 18 F.3d at 1010) (internal quotation marks omitted).

Even assuming that Mr. Porter's testimony at his trial was protected speech, and that Mr. Porter was subjected to adverse employment actions, *see* Pl.'s Opp'n 2-3, Mr. Porter has not put forward evidence from which a jury could find a causal connection between his testimony and the adverse action.  To establish the causal-connection element of a *prima facie* case, a plaintiff must put forward evidence of a "causal connection . . . sufficient to warrant the inference that the

16

protected speech was a substantial motivating factor in the adverse employment action." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006) (quoting *Blum*, 18 F.3d at 1010 (internal quotation marks omitted)).  This causal connection can be demonstrated "indirectly 'by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus.'"  *Cobb v. Pozzi*, 363 F.3d 89, 108 (2d Cir. 2003) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)).  But "a plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link.  Instead, he must produce 'some tangible proof to demonstrate that his version of what occurred was not imaginary.'"  *Ibid.* (alteration omitted) (quoting *Morris*, 196 F.3d at 111).

Mr. Porter has not set out evidence from which a factfinder could conclude that he established his *prima facie* case with respect to causal connection.  He offers no direct evidence that any of the defendants took adverse action against him because of his testimony at Mr. Croffie's trial or administrative hearing, such as emails, internal memos, or testimony.  Instead, he relies on the temporal proximity between his testimony and the commencement of the Florida-plates investigation.  Pl.'s Opp'n 4.  But that investigation did not come close enough in time to Mr. Porter's testimony to support an inference of causal connection.  The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (citations omitted), but "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line," *Clarke v. N.Y.C. Dep't of Educ.*, No. 18-CV-06783 (AMD) (SJB), 2021 WL 123358, at *9 (E.D.N.Y. Jan. 13, 2021) (quoting *Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522 (CPS), 2006 WL 842914,

at *15 (E.D.N.Y. Mar. 28, 2006) (collecting cases)) (alteration omitted).   Mr. Porter's trial testimony came before his administrative hearing testimony.   Porter Dep. 257:22-258:25.   And his June 2012 administrative hearing testimony was over nine months before the commencement of Investigator Tucci's Florida-plates investigation in March or April 2013.   *Id.* 257:22-258:25, 261:15-262:3; Croffie Hearing 4; Tucci Dep. 44:10-14.   Accordingly, too much time passed to support any inference that the Mr. Porter's testimony was causally connected to Investigator Tucci's investigation.   Defendants are therefore entitled to summary judgment on Mr. Porter's First Amendment-based retaliation claim, as well.

## II.     Section 1983 Failure-to-Promote Claims

Mr. Porter claims that defendants deprived him of equal protection of the law, in violation of Section 1983, by failing to promote him on account of his race or as retaliation for opposition to racial discrimination at Mr. Croffie's trial and hearing.   Pl.'s Opp'n 22-25.   Although Mr. Porter's complaint speaks vaguely of different "promotions," Second Am. Compl. ¶ 20, his briefing addresses promotions to only two positions: Director of Operations and Air Train Manager at JFK.   *See* Pl.'s Opp'n 22-24.   Consequently, Mr. Porter has abandoned his failure-to-promote claims except as to these two positions.   *See, e.g.*, *Pierre v. City of New York*, No. 17-CV-5782 (JGK), 2020 WL 353538, at *7 (S.D.N.Y. Jan. 21, 2020), *aff'd*, 844 F. App'x 411 (2d Cir. 2021) (citing *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 352-53 (S.D.N.Y. 2017)).   Claims of discriminatory treatment under Section 1983 are evaluated under the burden-shifting framework of *McDonnell Douglas*.   *Ruiz*, 609 F.3d at 491 (citations omitted).   To establish a *prima facie* case in the context of such a claim, Mr. Porter must show "(1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4)

18

the adverse action took place under circumstances giving rise to the inference of discrimination." *Id.* at 492 (citations omitted).

Mr. Porter has failed to establish a *prima facie* case related to the two promotional decisions he challenges, because a reasonable factfinder could not infer from the record that the promotional decisions took place under circumstances giving rise to an inference of discrimination or retaliation. To support an inference of retaliatory intent, Mr. Porter repeats his allegations about the supposedly retaliatory investigations that followed his testimony at Mr. Croffie's trial and hearing.  Pl.'s Opp'n 23-24.  But as noted above, Mr. Porter has failed to put forward evidence that those investigations were retaliatory.  As previously explained, the license-plate investigation came too long after Mr. Porter's testimony for temporal proximity to supply an inference that the license-plate investigation was retaliation for Mr. Porter's testimony.  *See* pages 17-18, *supra*.  It follows even more strongly that temporal proximity cannot provide a causal link between Mr. Porter's testimony and promotion decisions made two or three years after the testimony occurred. And no direct evidence suggests that the investigations were retaliatory, either.  *See* pages 17-18, *supra.*

To support an inference that the promotion decisions reflected racially discriminatory intent, Mr. Porter points to a disputed portion of a conversation in which Deputy Director Lawrence told Mr. Porter that he would not be promoted to Director of Operations.  Pl.'s Opp'n 23-24; Porter Dep. 421:4-6; Lawrence Dep. 163:20-166:20.  Deputy Director Lawrence recalls telling Mr. Porter that his use of out-of-state license plates reflected poorly on Mr. Porter's ethical judgment; Mr. Porter recalls Deputy Director Lawrence telling Mr. Porter that people like him should not drive such flashy cars.  Lawrence Dep. 163:20-166:20; Porter Dep. 240:2-6, 254:13-

15.  The Court accepts Mr. Porter's account for purposes of defendants' summary judgment motion, because Mr. Porter is the non-moving party.  *Tracy*, 624 F.3d at 95.

But a reasonable factfinder could not infer that Mr. Porter was the victim of racially discriminatory failures to promote based on this single remark.  Even on Mr. Porter's telling, Deputy Director Lawrence's remark did not refer to Mr. Porter's race, but rather spoke of "people like" Mr. Porter.  Porter Dep. 239:23-240:6.  Mr. Porter therefore premises his inference of discriminatory animus on the assertion that when Deputy Director Lawrence was speaking of people like Mr. Porter, he must have been referring to Mr. Porter's "race and color," Pl.'s Opp'n 10, as well as his gender, *id.* 24.  But Mr. Porter offers nothing to explain why Deputy Director's Lawrence alleged remark about "people like" Mr. Porter is most reasonably understood as a reference to people of Mr. Porter's race and gender, as opposed to, for instance, employees or security officials at Port Authority.  *See id.* 10 (asserting, without explanation, that "[b]ut for Porter's race and color, that conversation might seem unfathomable").  A single remark that is "vague" and "susceptible to any number of benign meanings," is not adequate to establish a prima facie case of prohibited discrimination.  *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 585 (S.D.N.Y. 2008); *see, e.g., Senese v. Longwood Cent. Sch. Dist.*, 330 F. Supp. 3d 745, 768-69 (E.D.N.Y. 2018) (finding remark that plaintiff, "as a man in the school," had "to be that much more careful than anybody else" too vague to warrant discriminatory inference); *Gilmore v. Lancer Ins. Co.*, No. 08-CV-0628 (JFB) (WDW), 2010 WL 87587, at *10 (E.D.N.Y. Jan. 7, 2010) (finding female decisionmaker's comment that plaintiff was "well built and things like that" too vague to show gender discrimination).  In sum, Mr. Porter has failed to make out a *prima facie* case that he was denied promotions as an act of prohibited retaliation or based on his race.

### III.    Section 1983 Hostile Work Environment and Selective Enforcement Claims

Defendants are entitled to summary judgment on Mr. Porter's claims that he suffered a hostile work environment and selective enforcement.  Mr. Porter posits that he was subjected to these harms in retaliation for exercising his First Amendment rights by testifying at Mr. Croiffie's hearing and trial.  Pl.'s Opp'n 10-12, 20-22.  But Mr. Porter has failed to provide an evidentiary basis from which a reasonable finder of fact could infer that he suffered the harms he alleges because of his protected speech.

Start with the hostile-work-environment claim.  Hostile-work-environment claims are actionable under Section 1983, s*ee Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 225-27 (2d Cir. 2004), though an individual defendant may only be liable when "his own actions are independently sufficient to create a hostile work environment," *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014).  In order to establish such a claim, a plaintiff must show not only that he was subjected to a hostile work environment, *see Patterson*, 375 F.3d at 227, but also that the "subjection to a hostile environment . . . occur[red] because of [the plaintiff's] . . . protected characteristic" or activity, *Gordon v. City of New York*, 612 F. App'x 629, 631 (2d Cir. 2015) (internal quotation marks omitted).  Here, the protected activity that Mr. Porter alleges is his testimony at Mr. Croffie's trial and hearing, and the actions he alleges constituted a hostile work environment are defendants' investigating him, failing to promote him, and ultimately terminating his employment.  Pl.'s Opp'n 20-22.  Assuming that such actions can undergird a hostile-work-environment claim, Mr. Porter's claim fails because he offers only unsustainably weak circumstantial evidence that the actions he characterizes as hostile were the result his testimony at Mr. Croffie's trial and hearing.  *See* pages 17-18, *supra*.  The alleged mistreatment that Mr. Porter cites did not come close enough in time to the protected activity to support an inference of causation based on temporal proximity.  And Mr. Porter points to no direct evidence that the

conduct of which he complains was motivated by retaliation.  Like other district courts facing similar circumstances, I conclude that Mr. Porter's hostile-work environment claim cannot survive summary judgment due to this deficiency.  *See, e.g.*, *Moses v. City of New York*, No. 06-CV-5974 (JSR), 2007 WL 2600859, at *2 (S.D.N.Y. Aug. 28, 2007) ("[P]laintiff's allegations of hostile workplace fail because she has introduced nothing to allow a finder of fact to link the harassment she alleges—primarily the harsh reviews she received from her superiors-to her age, race, color, or gender."); *Parekh v. Swissport Cargo Servs., Inc.*, No. 08-CV-1994 (CPS), 2009 WL 290465, at *5 (E.D.N.Y. Feb. 5, 2009).

The same basic deficiency is fatal to the selective-enforcement claim.  *See* Second Am. Compl. ¶ 111; *see also* Pl.'s Opp'n 10-12.  To establish an equal protection violation based on selective enforcement, a plaintiff must show that he was treated differently from other "similarly situated individuals," and that the differential treatment was "based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Bizzarro*, 394 F.3d at 86 (citation omitted). Here, Mr. Porter asserts that he was subject to differential treatment in retaliation for exercising his First Amendment rights at Mr. Croffie's trial and hearing.  Pl.'s Opp'n 10-12.  Specifically, he claims, defendants subjected him to "severe punitive action" for filing false and inaccurate financial disclosures but did not take similar action against "other employees found to have filed false or inaccurate disclosures."  *Id.* 11.

But Mr. Porter provides insufficient details to establish that these were "similarly situated" employees who were treated differently.  *Berg v. Kelly*, 897 F.3d 99, 113 (2d Cir. 2018) (citation and internal quotation marks omitted).  The only evidence Mr. Porter points to is a brief written by his criminal defense attorneys in his criminal trial arguing that the prosecution's informant only

targeted Mr. Porter—and not any other Port Authority employees.  *See* Letter to Honorable Mark Dwyer, Defs.' Ex. O at 4-5 (Dkt. #88-17).  Yet that brief does not appear to describe any particular Port Authority employees who had filed inaccurate disclosures in the past or include key facts such as what other positions those employees held; what precisely they failed to disclose; and how investigators came to learn of the deficiency.  Without specific evidence supporting the claim that there were other similarly situated employees who were treated differently, Mr. Porter cannot survive summary judgment.  *See, e.g.*, *Panzella v. City of Newburgh*, 231 F. Supp. 3d 1, 7-9 (S.D.N.Y. 2017), *aff'd*, 705 F. App'x 50 (2d Cir. 2017) (granting summary judgment on selective enforcement claim where plaintiff showed that comparator had been treated differently but failed to establish any other facts suggesting that the comparator was similarly situated to plaintiff) (collecting cases).

### IV.    Malicious Prosecution Claims

Mr. Porter brings two malicious prosecution claims:  one under Section 1983 and one under New York law.[2]  "[C]laims for malicious prosecution under § 1983 are 'substantially the same' as claims for 'malicious prosecution under state law.'"  *Lanning v. City of Glens Falls*, 908 F.3d 19, 25 (2d Cir. 2018) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003)).  "The elements of a malicious prosecution claim" under Section 1983 "are '(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor.'"  *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (quoting *Posr v. Court Officer Shield #207*, 180 F.3d 409, 417 (2d Cir. 1999)).

---

[2] Mr. Porter does not specify under which State's laws he brings his state-law claims.  The parties, however, assume that New York law applies.  *See* Defs.' Mem. 17-20; Pl.'s Opp'n 12-13,15-16.  Accordingly, the Court construes Mr. Porter's state claims to be asserted under New York law.

Similarly, under New York law, the elements of a malicious prosecution claim are "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations and internal quotation marks omitted); *Broughton v. State*, 335 N.E.2d 310 (N.Y. 1975) (same). Here, defendants are entitled to summary judgment on both the federal and state malicious prosecution claims because there is no genuine dispute that defendants did not initiate the prosecution of Mr. Porter, and because probable cause existed for Mr. Porter's prosecution.

### a. Initiation

Mr. Porter has not adduced evidence from which a jury could find that any of the defendants initiated his criminal prosecution. To "initiate" a prosecution in the Section 1983 context, "a defendant must do more than report the crime or give testimony. He must 'play[] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Manganiello*, 612 F.3d at 163 (quoting *Rohman*, 215 F.3d at 217). The same standard applies in New York. *See ibid.*; *Robles v. City of New York*, 961 N.Y.S.2d 533, 534 (N.Y. App. 2013) (citations omitted).

Here, there is no evidence that Investigator Tucci or any of the other defendants played a role in the criminal investigation beyond providing information to Trooper Oleson, who conducted his own investigation and independently made the decision to file a criminal complaint. Defs.' 56.1 at 12 ¶¶ 62, 64; Pl.'s 56.1 at 13-14 ¶¶ 62, 64. None of the defendants brought formal charges or prepared a criminal complaint. Nor is there evidence that any of the defendants created false information and gave it to prosecuting authorities. Furthermore, there is no evidence that any of

24

the defendants induced Trooper Oleson or Assistant State Attorney Powers to bring charges.  Thus, there is no material dispute of fact as to whether Investigator Tucci—or any other defendant— initiated the prosecution.  Defendants are therefore entitled to summary judgment on the malicious prosecution claims.  *See Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 532 (S.D.N.Y. 2015); *Bonds v. City of New York*, No. 12-CV-1772 (ARR) (MDG), 2014 WL 2440542, at *6 (E.D.N.Y. May 30, 2014); *Struthers v. City of New York*, No. 12-CV-242 (JG), 2013 WL 2390721, at *10 (E.D.N.Y. May 31, 2013).

Mr. Porter argues in his brief that Investigator Tucci initiated the investigation because he "venue-shopp[ed]" the investigation to different offices and "pushed" Trooper Oleson to press charges.  Pl.'s Opp'n 13.  Yet the record does not support these assertions.  To be sure, Investigator Tucci passed the results of his investigation to a number of law enforcement offices in New York.  Tucci Dep. 57:10-11, 59:8-25, 138:17-139:3.  And when these offices told him that criminal liability would not lie in New York but might in a different jurisdiction, *id.* 57:15-58:19, 139:4-8, Investigator Tucci forwarded the results to Trooper Oleson in Florida, *id.* 52:22-24.  But no evidence supports Mr. Porter's assertion that Investigator Tucci "pushed" Trooper Oleson to press charges.  As *Berry*, *Bonds*, and *Struthers* illustrate, merely passing information obtained in an investigation to another who begins a criminal prosecution does not amount to initiating a prosecution.  *See Berry*, 137 F. Supp. 3d at 532; *Bonds*, 2014 WL 2440542, at *6; *Struthers*, 2013 WL 2390721, at *10.  Accordingly, Mr. Porter's malicious-prosecution claim fails because none of the defendants initiated the prosecution.

### b.  Probable Cause

Even if Investigator Tucci did initiate the prosecution, probable cause supported the arrest and prosecution of Mr. Porter.  "Because lack of probable cause is an element of a malicious

25

prosecution claim, 'the existence of probable cause is a complete defense to a claim of malicious prosecution.'" *Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) (quoting *Manganiello*, 612 F.3d at 161-62 (citations and quotation marks omitted)); *see Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983) (same).  "Probable cause, in the context of malicious prosecution, has [] been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury*, 721 F.3d at 95 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)); *see Colon*, 455 N.E.2d at 1250 (same).  Here, Assistant State Attorney Powers relied on Trooper Oleson's felony complaint to bring charges against Mr. Porter.  Oleson Dep. 58:11-14; Pl.'s 56.1 ¶ 64.  In that complaint, Trooper Oleson explained that an investigation revealed that Mr. Porter owned four vehicles registered and/or titled in Florida and possessed an active Florida driver's license.  Oleson Felony Case Report 5.  When Mr. Porter had most recently renewed his Florida driver's licenses, he swore that he was a full-time resident of Florida.  *Ibid.* Trooper Oleson conducted a residence search for the Florida address associated with Mr. Porter's vehicles, and that search revealed that the residence was owned by Altina and Benton White—not Mr. Porter.  *Id.* 6.  Moreover, no tax record or other documentary information indicated that Mr. Porter had any ownership interest in the property.  *Ibid.*  Further, Mr. Porter acknowledges that at the time of the investigation, there was no document showing that he or his wife owned any interest in, paid any part of the purchase price for, or paid property taxes on the Florida property.  Porter Dep. 207:15-209:20.

Trooper Oleson's felony complaint also explains that he received a copy of Mr. Porter's work history from Investigator Tucci indicating that Mr. Porter was a full-time New York resident who also possessed a New York State driver's license.  Oleson Felony Case Report 6.  After learning that Altina and Benton White lived in New York, Trooper Oleson asked Investigator

Tucci to interview them.  *Id.* 7.  In that interview, Benton White stated that he and his wife were the sole owners of the Florida property and, to the best of his knowledge, no one else owned any interest in the property.  *Ibid.*  While Trooper Oleson had attempted call Mr. Porter to discuss his vehicle registrations, Mr. Porter declined to speak to him.  Oleson Dep. 56:19-57:2.  Taking all this evidence together, a reasonably cautious person would infer from this undisputed history that Mr. Porter was likely guilty of the crimes with which he was charged.  *See Stansbury,* 721 F.3d at 95; *Colon*, 455 N.E.2d at 1250.

Mr. Porter's arguments to resist this conclusion lack merit.  First, Mr. Porter argues that "the number of other Offices that outright told Tucci that this was not prosecutable is enough to warrant a 'cautious man' to stop there."  Pl.'s Opp'n. 14.  But the various New York prosecution offices never said that Mr. Porter's conduct was not prosecutable; they said that it was not prosecutable *in New York*—but it might be in a different jurisdiction.  Tucci Dep. 57:15-58:19, 139:4-8.  In any event, when the evidence of a crime is in fact strong enough to warrant a reasonable person's inferring a suspect's guilt—as it is in this case—it does not matter to the probable-cause analysis whether certain law enforcement officers viewed the strength of the evidence differently.

Second, Mr. Porter argues that defendants lacked probable cause because they were aware of facts indicating his innocence.  Pl.'s Opp'n 14.  To be sure, probable cause may be lacking where police investigators "have not made a complete and full statement of facts . . . [or] misrepresented or falsified evidence[.]"  *Boyd*, 336 F.3d at 76 (citations and internal quotation marks omitted).  But Mr. Porter has not put forward evidence that Investigator Tucci or Trooper Oleson ignored exculpatory material or that they misrepresented or falsified evidence.  Indeed, Mr. Porter himself acknowledges that no public documentation existed at the time of the investigation

to exonerate him.   Porter Dep. 207:15-209:20.   And he declined to be interviewed by Trooper Oleson prior to the filing of the felony complaint.   Oleson Dep. 56:19-57:2.   In fact, only two pieces of exculpatory evidence appear in the record: the affidavits of Mr. Porter's wife and her sister Ms. White.   And both were written and filed with Florida prosecutors *after* Mr. Porter's arrest.   *See* Affidavit of Sevenesa Porter; Affidavit of Altina White.   Accordingly, Mr. Porter's malicious-prosecution claim fails for the independence reason that probable cause existed for his prosecution.

## V.        Section 1983 False Arrest

Mr. Porter claims that he was falsely arrested in both Florida and New York, in violation of Section 1983 and the Fourth Amendment.   *See* Second Am. Compl. ¶¶ 82-86.   To prevail on a claim for false arrest under Section 1983, a plaintiff must show that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged."   *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021) (quoting *Jocks*, 316 F.3d at 134) (internal quotation marks omitted).   While "liability may not be premised on merely furnishing information to law enforcement authorities . . .   one who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest."   *Wright v. Musanti*, 887 F.3d 577, 587 (2d Cir. 2018) (citation, internal quotation marks, and alteration omitted).   "[T]he existence of probable cause is an absolute defense to a false arrest claim."   *Ashley,* 992 F.3d at 136.

Defendants are entitled to summary judgment on Mr. Porter's false arrest claims under these standards.   Mr. Porter's false-arrest claims related to his arrest in Florida fail because no defendant initiated his arrest and because probable cause existed for his arrest.   His false-arrest

claims related to his New York arrest likewise falters because his conviction at trial establishes probable cause.

### a. Florida Arrest

Mr. Porter's false-arrest claim based on his Florida arrest for title fraud and perjury fails because (1) the defendants did not actively participate in that arrest and (2) the arrest was supported by probable cause.

Mr. Porter's claim for false arrest fails because none of the defendants procured or participated in his confinement. First, plaintiff has not pointed to evidence from which a jury could infer that Investigator Tucci detained Mr. Porter or procured his arrest. *See* Defs.' 56.1 at 11-12 ¶¶ 57-64, Pl.'s 56.1 at 11-12 ¶¶ 57-64, 28-29 ¶¶ 23-25. While Investigator Tucci furnished Trooper Oleson with information related to Mr. Porter's license plates and asked him to look into whether a crime was committed, Tucci Dep. 52:22-24; Oleson Dep. 19:6-20:15, 42:2-10; Kane Dep. 181:20-182:10, Investigator Tucci denies ever suggesting that Mr. Porter should be prosecuted, Tucci Dep. 56:8-22, and plaintiff has not adduced evidence to the contrary.

Similarly, Supervisor Kane never attempted to persuade or influence Florida officials to arrest or prosecute Mr. Porter. Indeed, his only contact with Florida officials occurred when he put Investigator Tucci and Trooper Oleson in contact with one another. Tucci Dep. 51:6-53:3, 56:8-15, 65:20-66:7. And while Investigator Quaglia testified to speaking to Florida authorities to ask for a status update on the investigation, he denied requesting any specific type of action be taken. Quaglia Dep. 52:4-53:12. Absent evidence that these defendants did more than provide information to law enforcement officers, they cannot be liable for false arrest.

Mr. Porter's Florida claim for false arrest fails as to all other individual defendants because there is no evidence suggesting that any of the other defendants so much as spoke to Trooper Oleson, Assistant State Attorney Powers, or any other Florida official.

And even setting aside these deficiencies, Mr. Porter's false arrest claim based on his arrest in Florida would fail because the arrest was supported by probable cause. *See* pages 17-18, *supra.*

### b. New York Arrest

Plaintiff's false-arrest claim based on his arrest in New York for offering a false instrument for filing fails because that arrest was supported by probable cause. *See Ashley*, 316 F.3d at 136. A criminal conviction establishes probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Negrito v. Buonaugurio*, 836 F.App'x 36, 38 (2d Cir. 2020) (same). It is undisputed that Mr. Porter was convicted of offering a false instrument for filing in the first degree. Defs.' 56.1 at 18 ¶ 95; Pl.'s 56.1 at 22 ¶ 95. Accordingly, summary judgment is granted against his false-arrest claim stemming from his New York arrest.

### VI.   Section 1983 Unlawful Search

Mr. Porter has failed to set out facts from which a jury could find that Investigator Tucci violated Mr. Porter's Fourth Amendment rights. The Fourth Amendment protects against "unreasonable searches and seizures." Mr. Porter alleges that Investigator Tucci committed an unreasonable search by conducting surveillance of his vehicle in a parking lot and by looking up his plate and vehicle registration in a database without "reasonable suspicion of criminal activity." Pl.'s Opp'n 5-6. But Investigator Tucci did not need reasonable suspicion for those activities. Ordinary visual surveillance from a public place does not amount to a search. *See Kyllo v. United States*, 533 U.S. 27, 32 (2001) (citing *Dow Chemical Co. v. United States*, 476 U.S. 227, 234-235 (1986)); *United States v. Knotts*, 460 U.S. 276, 282 (1983). Similarly, a government employee's

search of public records such as vehicle, license plate, or registration records does not violate the Fourth Amendment. *See Doe v. City of New York*, 15 F.3d 264, 268 (2d Cir. 1994) (citing *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 493-96 (1975)); *Lisenby v. Lear*, No. 09-CV-410 (DCN), 2013 WL 3762953, at *3 (D.S.C. July 16, 2013) (finding that plaintiff had no privacy interest in vehicle information in a public database), *aff'd*, 563 F. App'x 240 (4th Cir. 2014); *Holder v. City of Allentown*, 151 F.R.D. 552, 554 (E.D. Pa. 1993) (finding that plaintiff had "no reasonable expectation of privacy in the address listed in his motor vehicle registration records— which is of public record and available to anyone who requests the information").

Accordingly, summary judgment is granted to Mr. Porter's unlawful search claim.

## VII.    Abuse of Process Claims

Mr. Porter brings abuse-of-process claims under Section 1983 and New York state law. A Section 1983 claim for malicious abuse of process will lie against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). The same standard applies in New York. *Ibid.*

Mr. Porter has failed to create a genuine dispute of material fact that defendants aimed to achieve a collateral purpose through their use of process. To satisfy the collateral-purpose requirement, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution." *Savino*, 331 F.3d at 77; *Dean v. Kochendorfer*, 143 N.E. 229 (N.Y. 1924). That is, "a malicious motive alone" is not sufficient to meet the collateral purpose requirement. *Savino*, 331 F.3d at 77 (quoting *Curiano v. Suozzi*, 63

N.Y. 2d 113, 117 (N.Y. 1984) (internal quotation marks omitted)). "Instead," a plaintiff must "claim that [defendants] aimed to achieve a collateral purpose beyond or in addition to" the purposes of the litigation that the defendants initiated. *Ibid*. Thus, for example, a plaintiff does not state a claim for malicious abuse of process by alleging that city officials who investigated and arrested him had malicious motives for doing so, absent evidence that the officials were seeking to pursue "a ulterior purpose or objective" outside of the prosecution. *Id.* at 77-78.

Both of Mr. Porter's abuse-of-process claims fail because he has not offered evidence from which a factfinder could determine that his arrest was for a collateral purpose. Mr. Porter alleges that defendants retaliated against him by subjecting him to criminal charges that were baseless. *See* Pl.'s Opp'n 16-17. That allegation amounts only to a claim of improper motive. Courts in this district routinely dismiss abuse-of-process claims where the plaintiff alleges that defendants conducted an investigation because of an improper motive, but the plaintiff does not allege that the defendants sought to achieve "an effect outside the intended scope of operation of the process employed." *Goldring v. Zumo*, No. 14-CV-4861 (BMC), 2015 WL 148451, at *3 (E.D.N.Y. Jan. 12, 2015) (holding that defendant's intent to employ legal process to harm plaintiff's business is not sufficient unless used "to compel some other result") (citing several cases). Mr. Porter's Section 1983 claim for malicious abuse of process fails under these precedents because he fails to allege—much less prove—that any defendant had a collateral purpose in their use of process.

## VIII.   Section 1983 Harassment Claim

Defendants are entitled to summary judgment on Mr. Porter's claim for harassment in violation of Section 1983 because Mr. Porter has not adduced evidence from which a jury could conclude that defendants engaged in harassment that violated his substantive due process rights. Second Am. Compl. ¶ 89; Pl.'s Opp'n 17-19. The Second Circuit has held that "a true pattern of

harassment by government officials may make out a section 1983 claim for violation of due process of law." *Chalfy v. Turoff*, 804 F.2d 20, 22 (2d Cir. 1986). "*Chalfy* claims are exceedingly difficult to prove." *Bertuglia*, 133 F. Supp. 3d at 637 (quoting *Kastle v. Town of Kent*, No. 13-CV-2256 (VB), 2014 WL 1508703, at *9 (S.D.N.Y. Mar. 21, 2014)). They must involve conduct that "can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir. 1994) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)) (internal quotation marks omitted). "Generally, defendants in [*Chalfy*] cases either acted illegally, or used their legal authority for a purpose other than that for which it was intended." *Bertuglia v. City of New York*, 133 F. Supp. 3d 608, 637-38 (S.D.N.Y. 2015) (quoting *Contractors Against Unfair Taxation Instituted on New Yorkers v. City of New York*, No. 93-CV-4718 (KMW), 1994 WL 45553, at *3 (S.D.N.Y. Aug. 19, 1994)), *aff'd sub nom. Bertuglia v. Schaffler*, 672 F. App'x 96 (2d Cir. 2016); *Vaher v. Town of Orangetown*, 133 F. Supp. 3d 574, 601-02 (S.D.N.Y. 2015) (same).

Mr. Porter has not offered allegations from which a reasonable jury could find that this standard was satisfied. Mr. Porter first points to defendants' decision to refer him to prosecutors and to an insurance company for possible license-plate-related fraud—even though defendants made no comparable referral related to other vehicles with out-of-state plates in the Port Authority parking lot. Pl.'s Opp'n 18. But uncontroverted evidence indicates that those vehicle owners were not similarly situated. Investigator Tucci testified that roughly thirty vehicles were observed in the Port Authority lot had out-of-state licenses. Tucci Dep. 70:8-10. All but four belonged to transients whose vehicles were not present in subsequent checks of the parking lot. *Id.* 171:22-172:10, 209:20-210:10. Of the four non-transient vehicles, two belonged to non-Port-Authority employees, one belonged to Mr. Porter, and one belonged to Ms. Dickey—who, like Mr. Porter,

33

was a "high-level manager." *Id.* 74:5-75:10, 116:9-124:23.  Investigator Tucci testified that he treated the non-Port-Authority employees differently than Mr. Porter because they did not work for Port Authority.  In contrast, Mr. Porter worked for the Port Authority "in a very high-level security position." *Id.* 130:9-14.  Investigator Tucci further explained that he did run a report on Ms. Dickey, who was a relatively new hire, but that by the time he did, she had changed her license plates to New York plates.  *Id.* 75:1-10.  Mr. Porter does not dispute any of these facts, s*ee* Pl.'s 56.1 at 27 ¶ 22 (drawing facts primarily from Investigator Tucci's deposition), and he points to no evidence that Investigator Tucci's account was inaccurate or pretextual.  In sum, uncontroverted evidence reflects that the other owners of out-of-state vehicles seen in the Port Authority parking lot were not similarly situated to Mr. Porter.  Accordingly, Mr. Porter has not put forward evidence from which a factfinder could determine that Investigator Tucci or other defendants acted in an "arbitrary" or "conscience-shocking" manner in referring Mr. Porter for investigation or prosecution relating to possible license-plate fraud.  *Interport Pilots Agency, Inc.*, 14 F.3d at 144.

Mr. Porter has also failed to offer evidence of other acts from which a jury could find arbitrary or conscience-shocking harassment.  Mr. Porter points to the fact that he was investigated and reprimanded for violating a lost-and-found policy regarding prisoner property.  Pl.'s Opp'n 18.  He does not deny that an evidence custodian had told him about the policy, *see* Letter of Reprimand 1; Pl.'s 56.1 at 17 ¶ 74, but he suggests that defendants' investigation and reprimand amounted to harassment because the policy had not been written down, Pl.'s Opp'n 18; *see* Pl.'s 56.1 at 17 ¶ 74.  Alternatively, Mr. Porter argues that defendants harassed him by arresting him, without first "offer[ing him] the opportunity to correct" his financial disclosures.  Pl.'s Opp'n 18.  He protests that the Port Authority's "code of ethics" called for the Port Authority to first "inform him" of the mistakes.  *Ibid.*  But no reasonable factfinder could determine that defendants engaged

in arbitrary or conscience-shocking behavior by investigating or reprimanding him for violating a policy, merely because the policy was conveyed orally rather than in writing.  Nor could a reasonable factfinder conclude that defendants committed acts that shocked the conscience because they did not offer Mr. Porter "the opportunity to correct" apparent financial-disclosure violations, *ibid.*, before he was arrested for receiving undisclosed payments.  Even taking all of Mr. Porter's factual allegations together and viewing them in the light most favorable to him, Mr. Porter paints only a picture of investigators who were "at most a bit overzealous" in investigating a high-ranking employee at the Port Authority.  *Chalfy*, 804 F.2d at 22.  Because Mr. Porter has failed to adduce facts supporting a claim of conscience-shocking harassment, defendants are entitled to summary judgment on this claim.

### IX.    Section 1985 and 1986 Claims

Mr. Porter's claims under Section 1985 and Section 1986 fail.  Section 1985 prohibits conspiring to deprive a person of equal protection of the laws or of equal privileges and immunities, based on race "or perhaps otherwise class-based, invidious discriminatory animus." *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (citation omitted).  To survive a motion for summary judgment on a Section 1985 claim, a plaintiff must therefore "come forward with at least some credible evidence" of such animus.  *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002) (citations omitted); *see Mian*, 7 F.3d at 1088.

Plaintiff has failed to do so.  He suggests that his arrests in Florida and New York, Second Am. Compl. ¶¶ 109-111, and his suspension from work, Pl.'s Opp'n 25-28, were motivated by racial animus or constituted retaliation for his testimony in the Croffie matter.  But he has proffered no evidence to support these theories.  Instead, Mr. Porter "has 'done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his] race,'"

*Grillo*, 291 F.3d at 235 (quoting *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 104 (2d Cir. 2001)), or to his testimony.  That "is not sufficient."  *Ibid.*

The failure of plaintiff's Section 1985 claim dooms his Section 1986 claim as well.  "[A] § 1986 claim must be predicated upon a valid § 1985 claim."  *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999) (citations omitted).  Since Mr. Porter's Section 1985 claim fails, his Section 1986 claim fails too.

## X.    *Monell* Claims

Mr. Porter's claims against the Port Authority fail because his claims against the individual defendants fail.  Under the *Monell* doctrine, a municipal entity may be held liable under Section 1983 if a constitutional violation was caused by a municipal "policy or custom."  *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694-95 (1978); *see Patterson*, 375 F.3d at 226 (citing *Jett v. Dallas Indep. Sch. Dist*., 491 U.S. 701, 733-36 (1989); *Monell*, 436 U.S. at 692-94).  Because no constitutional violation was committed against Mr. Porter by the individual defendants, as explained above, *see* pages 13-36, *supra*, no *Monell* claim can lie against the Port Authority*, see Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").

## XI.   State Discrimination Claim

As Mr. Porter concedes, *see* Pl.'s Opp'n 31, his claim under New York Executive Law 296 must be dismissed because the Port Authority is not bound by single state legislation.  *See Dezaio v. Port Auth. of N.Y. and NJ*, 205 F.3d 62, 65-66 (2d Cir. 2000) (affirming that New York and New Jersey's anti-discrimination laws do not apply to the Port Authority because single state legislation will not apply to a bi-state agency).  Accordingly, that claim is dismissed.

**CONCLUSION**

Summary judgment is granted to defendants on all claims.  The Clerk of the Court is respectfully directed to issue judgment in defendants' favor and close the case.

SO ORDERED.

/s/ Rachel Kovner
RACHEL P. KOVNER
United States District Judge

Dated: March 31, 2022
       Brooklyn, New York